## Gisaf *versus* Neval.

1. A man seduced a female and induced her to submit to an operation for
abortion, resulting in her serious sickness, and suffering. After her recovery
he said he would buy her a house for what she had suffered for him.    She
contracted for a house, he gave her the purchase-money, and she paid for it
before and at the time the deed was delivered to her.    *Held,* that no trust
resulted to him, by his furnishing the purchase-money.

2. A judgment was afterwards recovered against him, under which
his interest in the land was sold.    In ejectment by the purchaser against the
female for the house, *Held,* that the gift was executed, and she was not
seeking to enforce a contract founded on an immoral consideration, although
the criminal intercourse was continued after she received the deed.

[Gisaf v. Neval.]

March 10th 1876. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Error to the Court of Common Pleas of *Berks county*: Of January Term 1876, No. 54.

This was an action of ejectment commenced May 7th 1872, by William Neval and Maria, his wife, for her use, against Mary Ann Gisaf and another, for a house and lot on Penn street in the city of Reading.

The premises had belonged to E. G. Fishburn, who on the 1st October 1868 conveyed them to Mary Ann Gisaf, who was then a minor.

On the 25th of March 1871, a judgment was recovered against William Neval on a note dated December 5th 1870. The plaintiff in the judgment alleging that all the purchase-money had been paid by Neval and that therefore there was a resulting trust in him, issued an execution and had the premises levied on; Neval's interest in them was sold by the sheriff to James Koch, who on the 7th of November sold to Maria Neval the wife of William.

The facts as they appeared by the evidence on the trial September 2d 1875, before Van Reed, J., are as follows:—

The defendant, when about thirteen or fourteen years of age commenced working with Neval—who was a married man—in his factory; about a year after she came there he commenced attempting her seduction and after some time succeeded; the criminal intercourse was continued and her pregnancy was the result. He induced her to be operated on to produce abortion. A physician procured by him operated on her and for a long time afterwards she was very sick, suffering very greatly. After she got well on one occasion, as she testified: " He said he would buy me a house; that he would pay me for having suffered for him.; he said he did not want me disgraced; that if I lost my good name it would be through him; that he would keep my name up; that he wanted me to be thought of as much as the rest. On the next day he said, 'Mary, I have made up my mind to make you a present of a house.' He said I should look for a house. I found Mr. Fishburn's, the one I now live in." Her father and Fishburn agreed upon the price, $4300; $200 were to be paid down. She told Neval, and he gave her that sum. On the 1st of October 1868, when the deed was made, he gave her $1600, in the afternoon, at the factory. They went to the law office of F. L. Smith, Esq., and by Neval's instruction, she said she was of age, and that the $1600 were wages she had earned at the factory. Mr. Smith was to see that everything was correct. She paid it in the evening to Fishburn, in the office of the attorney of Fishburn, Mr. Schumaker, who prepared the deed. She then got the remainder of the money, $2500, from Neval, and she gave him a judgment-bond for it. He afterwards, June 21st 1869, gave her the bond,

[Gisaf *v.* Neval.]

with a receipt on it, saying to her that it was hers ; he had cancelled the bond in the office, and it was then all square.   The deed for the house was handed to her, by Neval, at Schumaker's office, when the $1600 were paid.   He told her not to give it up ; to have it recorded next day.

On cross-examination, she said : "He owed me the money for my good character, and for the shame and disgrace he had brought upon me, and for that he bought me this house ; by shame and disgrace, I mean I had intercourse with him."   She continued to have intercourse with him until some time in 1871.

The defendant's points were :—

1. Under the evidence in the cause there was no resulting or constructive trust in William Neval at the time of the sheriff's sale, and that therefore the plaintiff is not entitled to recover.

2. The evidence of Mary E. Gisaf, that the money furnished her was a gift to her, rebutted the presumption of any resulting or constructive trust in William Neval.

The court charged :—

"The plaintiff rests her claim on the sheriff's deed of the 21st October 1871, to her for all the right and title which William Neval had in the property at the time of the rendition of the judgment in favor of Ross, Schott & Co., on the 25th March 1871. Had William Neval any title to this property at the time ?   This is the question to be decided here.   If he had, the verdict must be for the plaintiff ; if not, then for the defendants.   *   *   *

"It is in evidence that the $200 paid by Daniel Gisaf had been previously handed to Mary by Neval to be paid on the agreement. Mary testifies that Neval had previously said to her that he would buy her a house.   When the deed was delivered nothing was said by the parties—but a judgment bond was given by Mary to Neval for $2500, payable in one year with interest, which was entered in the prothonotary's office on the 2d day of October 1868, and subsequently cancelled by Neval, and as both say without any money having been paid by Mary.   It is an admitted fact in this case, that Mary was a single woman and under the age of twenty-one years when the deed and judgment bond was executed.   It is also conceded that Neval was a married man with a wife and children living.   Both parties then resided and still reside in the city of Reading.   It will now be necessary to go back in the history of this transaction.

"Neval, a married man, with a wife in full life, and Mary, a single woman and between fifteen and sixteen or sixteen and seventeen years of age, began some seven or eight years ago to have sexual intercourse with each other, and after this had continued for some time it resulted in her pregnancy.   An abortion was procured, and she became dangerously sick for a time. * * * [The defendant testifies that Neval owed her and gave her the money for the shame and

[Gisaf v. Neval.]

disgrace he had brought upon her.] [It is also in evidence, that after the delivery of the deed, and up to a few years ago, the parties continued criminal intercourse between them as before. * * * Now, the question arises, did this state of facts put the title of this property in Mary or in Neval. The law establishes a resulting trust in favor of one who pays the purchase-money, where the deed is to another.] [Now here, if the jury shall find that the purchase-money was paid by Neval, then a resulting trust would be created in his favor, which could only be defeated by the declarations and acts of the parties accompanying the transaction. If the nominee in the title be a wife, or a child, or a grandchild, or one to whom the purchaser stands in *loco parentis*, the moral obligation to provide for such a party is at once recognised and an advancement is presumed, but brothers are not within this rule. What presumption arises in favor of the defendants here ? Who were the parties and what were their relations toward each other ? Was there any legal or moral obligation due from one to the other ? They were in *pari delicto*, and she could as little maintain an action against him as he against her.] * * * [In the absence of precedent, we are to decide this case upon the well-known principle of law that an immoral consideration will never support a contract. To hold this title to be valid in Mary under the evidence in this case, the court and jury would set a premium on immorality and encourage infidelity to the marriage relations."]

The verdict was for the plaintiff.

The defendants took a writ of error.

They assigned for error :—

1, 2. The refusal of the court to affirm their points.

3–5. The first three portions of the charge in brackets.

6. The last portion of the charge in brackets.

*J. S. Livingood* and *F. L. Smith*, for plaintiffs in error.—A trust by implication arises from the fact that the alleged beneficiary is the real purchaser, purchased with that intent and paid the purchase-money. The trust arises from the ownership of the purchase-money paid, and rests on no other foundation, and is *the only efficient cause*. Some intention must appear, so as to raise the trust: Wallace v. Duffield, 2 S. & R. 523; Silverthorn v. McKinster, 2 Jones 71; Lloyd v. Carter, 5 Harris 220; Morey v. Herrick, 6 Id. 129. The material point is the time when the rights of the respective parties vested: Edwards v. Edwards, 3 Wright 378. This transaction was no trust, but an executed gift: Shaw v. Read, 11 Wright 103. This rebuts the presumption of a trust: Lynch v. Cox, 11 Harris 268; Strimpfler v. Roberts, 6 Id. 298. Although the money may have been in consideration of past illicit intercourse, it could not be recovered back : Fox v. Cash, 1 Jones 211; Lestapies v. Ingraham, 5 Barr

81; Shenk *v.* Mingle, 13 S. & R. 32; Turner *v.* Vaughan, 2 Wilson 339.    When the money was given, the plaintiffs in the judgment under which the sale was made were not creditors; the gift was no fraud as to them, and they could not take advantage of it: Greenfield's Estate, 2 Harris 489; Mateer *v.* Hissim, 3 Penna. R. 160; Chambers *v.* Spencer, 5 Watts 404.

*H. C. G. Reber* and *G. F. Baer*, for defendants in error, cited Lynch *v.* Cox, Edwards *v.* Edwards, *supra*, as to resulting trusts from payment of purchase-money; and as to immoral consideration, 2 Kent's Com. 466; 1 Story's Eq. § 296; Perry on Trusts, §§ 214, 216; Hill on Trustees 164; Priest *v.* Parrot, 2 Vesey, Sr. 60; Dean *v.* Negley, 5 Wright 317.

Mr. Justice PAXSON delivered the opinion of the court, May 8th 1876.

We are unable to see anything in the evidence in this case to raise an implied or resulting trust.   William Neval, plaintiff below, seduced Mary Ann Gisaf, defendant below, who was at the time a young girl, and in his employ.   In order to hide the evidence of his crime and her shame, he advised and procured an operation to be performed upon her, resulting in serious and protracted illness.    After she recovered, to use her own words, " William Neval said he would buy me a house; that he would pay me for what I had suffered for him.   He said he did not want me disgraced; that if I lost my good name it would be through him."   Shortly after this a house was purchased by the defendant for $4300, the money for which was all furnished by Neval.   This is the story, briefly stated, of this transaction, as it appears upon the record.   That it was a gift of the money by Neval to the defendant, is clear from the evidence.   That there could be no implied or resulting trust in such case, is too plain for argument.

That "an immoral consideration will never support a contract," as was said by the learned judge of the court below, in that portion of his charge contained in the 6th specification, is doubtless true as an abstract proposition.    But it has no application to this case. The defendant is not seeking to enforce such a contract.    The contract, so far as one existed, has been fully executed. · This is the case of a man who has wronged a woman, who has made her a compensation for that injury, and who now seeks to recover it back.   In this the law will not help him.   As he has sown, so must he reap.

Judgment reversed, and a *venire facias de novo* awarded.